**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Naomi Garcia,

        Plaintiff,

v.

Chandler-Gilbert Community College, *et al.*,

        Defendants.

No. CV-22-02169-PHX-JJT

**ORDER**

Before the Court is Defendant Maricopa County Community College District's Motion for Summary Judgment (Doc. 84, Mot.) and Motion to Strike Plaintiff's Contravening Separate Statement of Facts in Opposition to Defendant's Motion for Summary Judgment (Doc. 90). Both Motions have been fully briefed by the parties. For the reasons below, the Court grants Defendant's Motion for Summary Judgment and denies the Motion to Strike as moot.

## I.    BACKGROUND

As a threshold issue, Defendant moves to strike Plaintiff's Contravening Statement of Facts and Additional Statement of Facts she originally filed at Doc. 89 with her response brief. (*See* Doc. 90). Defendant argues that the Statements are noncompliant with this Court's orders and the Local Rules of Civil Procedure. For the purpose of resolving the Motion for Summary Judgment, the Court will consider Plaintiff's original Statements to allow full and fair deliberation of all Plaintiff's arguments and evidence.

. . .

The following facts are undisputed.[1] In February 2017, Defendant hired Plaintiff to work as a part-time Academic Advisor. (Doc. 85, SOF, ¶ 1; Doc. 89 at 1–37, CSOF, ¶ 1.) In November 2017, Ms. Alison Travis became the interim Director of Student Services and supervised Plaintiff. (SOF ¶¶ 2–4; CSOF ¶¶ 2–4.) In April 2018, Plaintiff applied for the permanent Director position. (SOF ¶ 10; CSOF ¶ 10.) She was not offered an interview. (SOF ¶ 11; CSOF ¶ 11.)

On May 15, 2018, Plaintiff emailed Defendant's Human Resources staff requesting information about the hiring process for the permanent Director position and the reasons for not providing her with an interview despite her qualifications. (SOF ¶ 12; CSOF ¶ 12; *see* Doc. 85-1 at 236.) Mr. Anthony Wilber, a Human Resources staff member, was assigned to review the hiring process. (Doc. 85-1 at 227, 236.) Mr. Wilber completed his review on June 18, 2018, concluded that the hiring process could proceed as planned, and emailed Plaintiff his report. (*Id*. at 222–23.) Mr. Wilber's report indicates that Dean of Enrollment Services, Dr. Felicia Ramirez-Perez, had personally screened Plaintiff's application and gave Plaintiff a score that rendered her ineligible for an interview. (*Id*. at 224.) That day, Plaintiff requested her score card and detailed feedback regarding the screening process. (*Id*. at 221–22.) Mr. Wilber directed Plaintiff to Dr. Ramirez-Perez, and Plaintiff then requested the same information from her in an email dated June 20, 2018. (*Id*. at 221.) In that email, Plaintiff clarified that she "would like to review this documentation for [her] personal knowledge moving forward . . . [and] as a learning opportunity." (*Id*.)

Ms. Travis was ultimately chosen as the permanent Director. (SOF ¶ 18; CSOF ¶ 18.) As Director, Ms. Travis was responsible for hiring, terminating, and disciplining staff she oversaw, which included Plaintiff. (SOF ¶¶ 19, 66; CSOF ¶¶ 19, 66.) Ms. Travis reported to Dr. Ramirez-Perez who in turn reported to Dr. Kishia Brock. (Doc. 85-1 at 351 ¶ 2, 352 ¶ 8.)

On September 27, 2018, Plaintiff was promoted to a full-time Student Services

---

[1] The Court references document page numbers as generated by the Electronic Case Filing system for all record citations herein.

Analyst pursuant to a six-month probationary period. (SOF ¶¶ 21, 24; CSOF ¶¶ 21, 24; Doc. 88, Resp., at 7.) On November 2, 2018, Plaintiff met with a student for an advisement session and, once it concluded, reported the encounter through an incident reporting system. (SOF ¶ 37; CSOF ¶ 37.) Plaintiff reported her observations about the student's behavior and concluded:

> Since I have concerns with the [student's] aggressive behavior toward the front desk staff and his comments regarding overall anger with multiple parties on the campus (including odd body language and behavior observed) discussed during our meeting, I wanted to report this so it is documented and campus safety is aware if anything were to happen in the future.

(Doc. 85-1 at 37–38.) Plaintiff also reported that, while the student was still present at the advisement center, she conferred with Ms. Travis about resources to provide the student before the student left. (*Id.*) Four days later, Ms. Travis met with Plaintiff to verbally discipline her for "mischaracterizing" the student interaction to Ms. Travis during their conferral on November 2, 2018. (SOF ¶¶ 44–45; CSOF ¶¶ 44–45.) On November 8, 2018, Ms. Travis memorialized the verbal warning in an email to Plaintiff. (SOF ¶ 47; CSOF ¶ 47; *see* Doc. 85-1 at 92–94.) In that email, Ms. Travis indicated that she believed Plaintiff failed to alert her of the student's concerning behavior when asked during their conferral and, as a result, "could have potentially jeopardized the safety of [Plaintiff] and others." (Doc. 85-1 at 92.) Ms. Travis also warned Plaintiff of conducting longer advisement sessions than her colleagues, which resulted in Plaintiff seeing fewer students overall. (*Id.*)

On December 4, 2018, Plaintiff met with Dr. Deric Hall, the Director of the Equal Employment Opportunity ("EEO") Office. (SOF ¶ 51; CSOF ¶ 51.) During that meeting, Plaintiff recounted her unsuccessful application for the permanent Director position and subsequent review of that hiring process. (SOF ¶ 52; CSOF ¶ 52.) Dr. Hall's handwritten notes of that meeting reflect that Plaintiff also described the November 8, 2018 email warning issued by Ms. Travis and reported her belief that the warning was issued in retaliation for Plaintiff's earlier complaints about the Director hiring process. (Doc. 85-1

at 146.) Dr. Hall noted that Plaintiff "is the only African American analyst in her work area. She plans to file a complaint against Ms. Travis." (*Id*.)

On December 17, 2018, Plaintiff submitted two complaints of race-based discrimination and retaliation against Ms. Travis and Dr. Ramirez-Perez, which Dr. Hall marked as received on January 2, 2019 ("EEO Complaints"). (*Id*. at 148–61.) On January 16, 2019, Dr. Hall sent Ms. Travis and Dr. Ramirez-Perez a letter informing them of the respective EEO Complaint against them. (SOF ¶ 57; CSOF ¶ 57; Doc. 85-1 at 163–67.) The next day, Dr. Brock, Dr. Ramirez-Perez, Ms. Travis, Human Resources staff member Lisa Kussard, and Plaintiff met to discuss how to improve communication and clarify expectations between Ms. Travis and Plaintiff. (SOF ¶ 62; CSOF ¶ 62.)

On February 20, 2019, Ms. Travis submitted a request for non-renewal of Plaintiff's employment past the probationary period. (Doc. 85-1 at 114–116.) The Human Resources department approved Ms. Travis' request. (SOF ¶ 65; CSOF ¶ 65.) One week later, Dr. Brock and a Human Resources staff member notified Plaintiff of her non-renewal. (SOF ¶ 67; CSOF ¶ 67.) That day, Plaintiff prepared and submitted a letter resigning from her position, noting that her "decision to resign [is] in lieu of termination" and "is not voluntary" but was "by request of Human Resources and Dr. Kishna Brock." (Doc. 85-1 at 403.) Her resignation was effective immediately.

On May 20, 2019, Dr. Hall completed an investigation of Plaintiff's EEO Complaints and concluded that they were unsubstantiated. (SOF ¶¶ 60–61; CSOF ¶¶ 60–61; *see* Doc. 85-1 at 286–98.) In that report, Dr. Hall noted the following:

> After Ms. Garcia filed discrimination complaints against Ms. Travis and Dr. Ramirez-Perez (Respondents), this investigator had a meeting with representatives from CGCC Human Resources (HR) and the District Office HR Solutions Center because CGCC was contemplating whether to extend Ms. Garcia's probationary period or non-retain Ms. Garcia for work performance issues and her behavior. At the conclusion of the meeting, CGCC did not make a decision on Ms. Garcia's employment. Several weeks later, this investigator was asked to attend a meeting with representatives from CGCC HR and

- 4 -

> District Office HR Solutions Center because Ms. Travis and Dr. Ramirez-Perez had made a decision not to retain Ms. Garcia. Dr. Kishia Brock, . . . Ms. Travis, and Dr. Ramirez-Perez were present at the meeting. During the meeting, Ms. Travis and Dr. Ramirez-Perez expressed their concerns with Ms. Garcia's work performance and behavior.

(Doc. 85-1 at 288–89.)

Plaintiff filed a charge of retaliation and race-based discrimination against Defendant with the Equal Employment Opportunity Commission ("EEOC") on April 5, 2019 (Doc. 56, SAC, Ex. A), and the EEOC issued Plaintiff a notice of right to sue on September 26, 2022.[2] Plaintiff timely filed this action and alleges two[3] causes of action arising under Title VII: (1) race discrimination on or after June 9, 2018[4]; and (2) retaliation on or after June 9, 2018. (SAC ¶¶ 38–59.) Defendant now moves for summary judgment.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011). "The Court need not 'comb the record' looking for other evidence; it is only required to consider evidence set forth in

---

[2] The EEOC Charge of Discrimination that Plaintiff attaches to her operative pleading reflects an entirely different charge against a different employer. (*See* SAC at Ex. A.) Neither party recognized this error, but no party disputes that Plaintiff properly filed an EEOC Charge and received the requisite notice before pursuing this action.
[3] Plaintiff alleged a third cause of action but voluntarily dismissed it. (Doc. 60.)
[4] The Court previously ruled that conduct occurring before this date is not actionable under Title VII because it would precede 300 days before Plaintiff filed her EEOC Charge, which renders that conduct time barred. (*See* Doc. 55 at 8–9.)

the moving and opposing papers and the portions of the record cited therein." *New Leaf Publ'g, Inc. v. Top Innovations LLC*, No. 2:24-cv-04676-MEMF-SSC, 2025 U.S. Dist. LEXIS 208363, at *5 (C.D. Cal. Oct. 21, 2025) (citing Fed. R. Civ. P. 56(c)(3), (e)(2); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001)).

As the moving party, Defendant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 232. When, as here, the moving party does not bear the ultimate burden of proof, it "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party does so, the nonmoving party must produce evidence to support its claim or defense. *Id.* at 1103. Summary judgment is appropriate against a party that "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

In considering a motion for summary judgment, the court must regard as true the nonmoving party's evidence if it is supported by affidavits or other evidentiary material. *Anderson*, 477 U.S. at 255. The nonmoving party may not merely rest on its pleadings; it must produce some significant probative evidence tending to contradict the moving party's allegations, thereby creating a material question of fact. *Id.* at 256–57 (holding that the plaintiff must present affirmative evidence to defeat a properly supported motion for summary judgment); *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data.") (citation modified).

## III.    ANALYSIS

### A.    Count One: Race Discrimination

Defendant contends that Plaintiff fails to establish a *prima facie* case of race

- 6 -

discrimination. (Mot. at 7.) Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [his] compensation, terms, conditions, or privileges of employment" or "to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee" because of such individual's race or color. 42 U.S.C. § 2000e-2(a).

Race discrimination claims require the plaintiff to prove that the employer acted with conscious intent to discriminate against the plaintiff based on his protected characteristic. *Costa v. Desert Palace*, 299 F.3d 838, 854 (9th Cir. 2002), *aff'd*, 539 U.S. 90 (2003). To do so, a plaintiff "must offer evidence that gives rise to an inference of unlawful discrimination, either through the framework set forth in *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973) or with direct or circumstantial evidence of discriminatory intent." *Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003) (citation modified). When a plaintiff responds to a summary judgment motion, she chooses how to establish her case either by using the *McDonnell Douglas* framework or by producing "direct or circumstantial evidence to demonstrate that a discriminatory reason more likely than not motivated" the defendant. *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004). While a useful "tool to assist plaintiffs at the summary judgment stage so that they may reach trial, nothing compels the parties to invoke the *McDonnell Douglas* presumption." *Costa*, 299 F.3d at 855.

Here, Plaintiff does avail herself of the *McDonnell Douglas* framework (Resp. at 13). Under that framework, Plaintiff must first establish the following elements of a *prima facie* case of discrimination: (1) she belongs to a protected class; (2) she was qualified for the position or performed the position satisfactorily; (3) she was subject to an adverse employment action; and (4) similarly situated individuals outside her protected class were treated more favorably. *McDonnell Douglas Corp.*, 411 U.S. at 802; *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006). A plaintiff's "requisite degree of

proof . . . is minimal and does not even need to rise to the level of a preponderance of the evidence."[5] *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994).

If Plaintiff establishes each *prima facie* element, the burden shifts to Defendant who must articulate legitimate, non-discriminatory reasons for the challenged action. *McDonnell Douglas Corp.*, 411 U.S. at 802. If Defendant meets this burden, Plaintiff must finally show that the "reason is pretextual either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (citation modified).

### 1.    *Protected Class*

Defendant does not contest that Plaintiff, an African American person, belongs to a protected class. Plaintiff therefore satisfies the first element of the *prima facie* case for race discrimination.

### 2.    *Performance of Position*

Defendant argues that "Plaintiff cannot make a prima facie case of race discrimination because she was not performing her job satisfactorily." (Mot. at 7.) According to Defendant, Plaintiff failed to abide by her supervisor's policies regarding time away from the office, failed to meet her supervisor's expectations for productivity and communication, did not complete assigned projects, and misadvised students. (*Id*. at 7–8.)

Plaintiff argues that she was "unquestionably qualified for her position," and "[f]or nearly two years, she had no documented performance concerns, was promoted into an Analyst role during MCCCD's busiest semester, and was even asked to train other Analysts just days before the adverse action of termination on February 27, 2019." (Resp. at 10; *see, e.g.*, Doc. 88-2 at 79 (screenshot showing Plaintiff's training schedule in January 2019).) The record does, in fact, demonstrate that Plaintiff was promoted in September 2018

---

[5] Defendant argues that Plaintiff must make an "extraordinarily strong showing of discrimination" to overcome the Ninth Circuit's same-actor inference arising from Ms. Travis hiring and firing Plaintiff. (Mot. at 10.) Without determining whether the same-actor inference applies, the Court declines to hold Plaintiff to that higher evidentiary standard for the purpose of resolving the present Motion.

despite some of the performance issues noted by Defendant having occurred *before* the promotion. There is also evidence that Plaintiff was tasked with training other analysts towards the end of her employment, which implies that she was believed to be capable of modeling and teaching job responsibilities. Moreover, there is no evidence that her job performance "was steadily declining" or that she was "placed on a performance improvement plan," which are some examples of "[t]he circumstances in which a plaintiff fails to meet the minimal *prima facie* burden." *Karthauser v. Columbia 9-1-1 Commc'ns Dist.*, 647 F. Supp. 3d 992, 1008 (D. Or. 2022).

The evidence produced by Plaintiff and all reasonable inferences drawn in her favor meet her minimal burden of showing that she performed her job satisfactorily and establishes a genuine issue of material fact as to the quality of her performance. Plaintiff satisfies the second element of the *prima facie* case for race discrimination.

3.    *Adverse Employment Action*

An adverse employment action is one that materially affects the compensation, terms, conditions, or privileges of employment. *Davis*, 520 F.3d at 1089. Termination, including non-renewal of a contract, qualifies as an adverse employment action. *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000); *Jadwin v. Cnty. of Kern*, 610 F. Supp. 2d 1129, 1171 (E.D. Cal. 2009). The harm from an employment action need not be significant to be adverse. *See Muldrow v. City of St. Louis*, 601 U.S. 346, 357 (2024). Still, actions that are trivial or have no tangible job consequence, such as a reprimand or low performance review without more, may not rise to the level of adverse. *Gildersleeve v. City of Sacramento*, No. 2:22-cv-02145-JAM-AC, 2025 U.S. Dist. LEXIS 144069, *6 (E.D. Cal. Jul. 28, 2025).

Neither party argues that the warning issued by Ms. Travis was adverse. Rather, the parties focus on Plaintiff's resignation. Defendant argues that it was voluntary, so she must "prove constructive discharge[6] for her resignation to be viewed as an adverse employment

[6] Under a theory of constructive discharge, a resignation is adverse when it was done "under circumstances in which a reasonable person would feel that the conditions of employment have become intolerable" and the employee "has simply had enough; she can't take it anymore." *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1110 (9th Cir. 1998) (citation

action." (Mot. at 11.) Plaintiff, however, contends that her resignation was done under a theory of coercion, not constructive discharge. (Resp. at 17.) An employee may demonstrate that her decision to resign was coerced if "a reasonable person in [her] position would feel [she] had no choice but to [resign]." *Knappenberger v. City of Phoenix*, 566 F.3d 936, 941 (9th Cir. 2009). To determine voluntariness, courts use an objective standard and consider "whether the employee was given an alternative to resignation . . . understood the choice, had a reasonable time in which to decide, or could select the timing of the [] resignation." *Id.* (citation modified). In cases where "the employee did have a choice, even if between comparatively unpleasant alternatives," the resignation is voluntary. *Id.*

It is undisputed that Dr. Brock and Human Resources staff met with Plaintiff on February 27, 2019 to discuss her non-renewal. (SOF ¶ 67; CSOF ¶ 67.) In support of both parties' respective arguments, they each exclusively cite Plaintiff's deposition testimony and her resignation letter. In her deposition, Plaintiff testified that Defendant provided her with two options: (1) be terminated and not subject to rehire at any of Defendant's many other locations[7]; or (2) resign and potentially be subject to rehire. (Doc. 85-1 at 388–89.) According to Plaintiff, Defendant required her to decide in that moment between those two options. (*Id.* at 389.) Plaintiff chose the latter because she did not want to be precluded from working at Defendant's other locations. (*Id.*) On this point, Plaintiff testified that she was prompted to write a letter of resignation and clearly expressed in that letter that her resignation was involuntary. (*Id.*; *see also* Doc. 85-1 at 403.) Per Plaintiff, she wrote the letter that way because "[i]t's not a voluntary resignation that I just sent on my own, wanting to resign from my job. I wanted to work there and I wanted to be there and I wanted my—I wanted the issue to be resolved." (*Id.* at 388–89.)

For summary judgment purposes, the Court credits Plaintiff's testimony which is not only consistent with the resignation letter, but also with the deposition testimony of Dr. Ramirez-Perez who asserted that "when someone is going to be terminated, they give the

---

modified). "Title VII encompasses employer liability for a constructive discharge." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 143 (2004).
[7] Defendant reports that it "is comprised of ten colleges and numerous community education centers throughout Maricopa County." (Mot. at 2.)

employee the option. We either terminate you, and you can never come back to the district and apply for jobs, or you can volunteer and resign and have an opportunity to come back, and from my—from my recollection of what was shared with me, that [Plaintiff] completed a resignation letter." (Doc. 85-1 at 372.)

Here, the only alternative to resignation offered by Defendant was termination. In either case she loses her job, and this is no feasible alternative by anyone's standards. While Plaintiff may have understood this choice, the record shows that she had no time to contemplate her choice and had no control over when her resignation would take effect. The absence of alternatives to resignation, the urgency imposed on Plaintiff, and the swiftness in which her resignation occurred all demonstrate that it was involuntary and, accordingly, a termination that constitutes an adverse employment action.[8]

4.    *Treatment of Similarly Situated Individuals*

Next, Defendant argues that "Plaintiff can point to no evidence that would show that she was treated differently than similarly-situated people outside of her protected class." (Mot. at 8–9.) There are various "truncated" methods by which a plaintiff can establish this element of a *prima facie* case of discrimination. *See Lui v. DeJoy*, 129 F.4th 770, 777–79 (9th Cir. 2025). In cases where a plaintiff is terminated, she can establish this element by showing that the employer: (1) continued to seek applications from individuals with the plaintiff's qualifications; (2) filled the position with a person outside the plaintiff's protected class; or (3) continued performing the plaintiff's duties even if the plaintiff's position was eliminated or never became filled. *Id*. at 777–78. Alternatively, a plaintiff can "show[] that others not in her protected class were treated more favorably" in certain factual situations. *Id*. at 778–79. "[I]ndividuals are similarly situated when they have similar jobs

---

[8] Plaintiff randomly asserts that she was entitled to a two-week notice of her non-renewal, which she characterizes as a "due process right" that she "was denied." (Resp; at 4 n.1; ASOF ¶¶ 20–21.) Even if she provided evidence that she was, in fact, entitled to a two-week notice or any right to employment while on probation—which she does not—the Court declines to find lack of notice to be an adverse employment action. *See DeWitz v. Teleguam Holdings, LLC*, No. 1:11-CV-00036, 2014 WL 3028660, at *4 (D. Guam July 3, 2014) (finding that lack of notice of termination was not an adverse employment action); *Chowdada v. Judge Tech. Servs., Inc.*, No. 4:18-CV-00655-JAR, 2021 WL 168742, at *3 (E.D. Mo. Jan. 19, 2021) (same).

and display similar conduct." *Vasquez*, 349 F.3d at 641.

Here, Plaintiff does not attempt to establish any of the truncated standards developed by the Ninth Circuit. Rather, she contends *only* "that Ms. Garcia was treated differently than similarly situated non-Black colleagues." (Resp. at 13.) Plaintiff argues that Ms. Travis "berated her for filing a Public Incident Report in accordance with mandatory protocol" while other analysts were not held to similar standards or issued a verbal warning. (Resp. at 9.) She also contends that Ms. Travis enforced "unwritten expectations against Ms. Garcia alone and scrutiniz[ed] her advising sessions despite conceding that no written policy governed such expectations during 2018" and despite at least one other analyst having similar performance issues. (Resp. at 13; Doc. 89 at 37–47, ASOF, ¶¶ 40, 66B.)

First, Plaintiff provides no evidence that other analysts filed an incident report or had a student interaction like the one she had, so no comparison as to whether Plaintiff's verbal warning differed from other analysts can be made at all.

Second, there is insufficient evidence that other analysts were having similar performance issues. Plaintiff declared that Ms. Travis told her "Thomas Hudson and Greg Wojtovich . . . took longer than 30 minutes with student appointments, but to [her] knowledge they were never disciplined, and certainly not terminated." (Doc. 88-3 ¶ 5.) But documents in the record show that Mr. Hudson and Mr. Wojtovich were not analysts like Plaintiff (*see, e.g.*, Doc. 85-1 at 33 (email to analysts that is not addressed to Mr. Hudson or Mr. Wojtovich)). The record demonstrates that other employee classifications exist in the department that Ms. Travis supervised, including "student service specialists." (Doc. 85-1 at 123.) Plaintiff produces no evidence, or even asserts, that Mr. Hudson or Mr. Wojtovich were analysts or had responsibilities similar to Plaintiff. Rather, Plaintiff generically describes them as "other non-Black employees." (Doc. 88-3 ¶ 5.) But this sweeping statement does not meet Plaintiff's burden to show that other analysts, or similar employees, were similarly situated to her such that a comparison between their respective treatment would be meaningful. *Vasquez*, 349 F.3d at 641 ("[I]ndividuals are similarly situated when they have similar jobs and display similar conduct."); *Paananen v. Cellco*

*P'ship*, No. C08-1042 RSM, 2009 WL 3327227, at *6 (W.D. Wash. Oct. 8, 2009) ("Comparator evidence is most relevant when the other employees work at the same part of the company as Plaintiff, have the same performance, qualifications, and conduct, and have a common supervisor.").

Third, Plaintiff cites a November 1, 2018 email from Ms. Travis to the analysts (including Plaintiff), wherein she instructs:

> Please be sure that you are all carrying the work of the team equally. I don't need to be specific, you know who is and who isn't. I should not see full-time Analysts seeing as many or less than our part-time advisor, when they aren't working on other projects. Please be aware of your time and be equitable, since you are the leaders of the department.

(Doc. 85-1 at 33.) But this email points to no one at all—it is generic by design and does not rise to the level of affirmative evidence of other analysts not meeting performance expectations like Plaintiff.

Fourth, Plaintiff cites the portion of Dr. Brock's deposition testimony where she could not recall any other analyst besides Plaintiff that was not retained or otherwise dismissed. (*See* Doc. 88-2 at 31.) But this testimony has no bearing on whether other analysts demonstrated similar conduct as Plaintiff during their employment.

Fifth, Plaintiff cites to an August 29, 2018 email that she referred as "Ex. C-2" to support that "Travis also told superiors that another Analyst had 'performance' issues like Ms. Garcia," (ASOF ¶ 66B), but the Court could not locate that document at all.

Lastly, the fact that these policies were not formally published until the month before Plaintiff's termination is not material as to whether they were previously conveyed to Plaintiff and others, and the evidence shows that they were communicated broadly, contrary to Plaintiff's contention otherwise. (*See* Doc. 85-1 at 33, 106, 138, 142.)

### 5.    *Other Evidence of Discrimination*

Plaintiff alternatively argues that Ms. Travis and Dr. Ramirez-Perez used racial stereotypes to describe Plaintiff that supports "a finding that her supervisors' judgments were influenced by bias rather than objective evaluation." (Resp. at 7–8.) Those descriptors

include "argumentative," "combative," "rude," "challenging," "dismissive," and "disrespectful." (Resp. at 7.)

"Direct evidence is evidence which, if believed, proves the fact of discriminatory animus without inference or presumption." *Coghlan v. Am. Seafoods Co. LLC*, 413 F.3d 1090, 1095 (9th Cir. 2005) (citation modified). While "derogatory comments made by a decisionmaker" can be "direct evidence of discriminatory animus and can create an inference of discriminatory motive," those comments "must be clearly sexist, racist, or similarly discriminatory." *Hittle v. City of Stockton, California*, 101 F.4th 1000, 1013 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 759 (2025). The case law of this Circuit is replete with examples of comments that are clearly discriminatory. *See, e.g.*, *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1038 (9th Cir. 2005) (supervisor commented that "women have no business in construction" and "women should only be in subservient positions"); *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1128 (9th Cir. 2000) (a member of the hiring committee that ultimately denied an employee's promotion stated that "two Chinks" in the department were more than enough); *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1149 (9th Cir. 1997) (a supervisor called another employee a "dumb Mexican").

Here, Ms. Travis' and Dr. Ramirez-Perez' comments about Plaintiff being "combative," "rude," and like terms are race-neutral and relevant to workplace dynamics with which a supervisor may concern herself. To conclude that the speaker was motivated by some discriminatory animus would require some inference or presumption which, by definition, is not direct evidence. *Coghlan*, 413 F.3d at 1095; *see also Gaines v. Nordstrom, Inc.*, No. 05 CV 689 PK, 2006 WL 2711779, at *5 (D. Or. Sep. 19, 2006) (finding that race-neutral statements were not direct evidence).

But even where an employer's critique or comment of an employee is race-neutral, an employer's clear use of stereotyping may demonstrate direct evidence of discriminatory animus. *See Lindahl v. Air France*, 930 F.2d 1434, 1439 (9th Cir. 1991) (a supervisor's belief that female candidates "get nervous" or "easily upset and lose control," and preference for a male candidate because he was "aggressive and cool" suggested that the

supervisor's ideas of leadership were based on gender stereotypes).

Here, Plaintiff argues that the terms used by Ms. Travis and Dr. Ramirez-Perez to describe Plaintiff evoked the "angry Black woman" stereotype. (Resp. at 7–8.) Plaintiff cites the concurrence of a Fourth Circuit case for the proposition that the presence of this stereotype alone is sufficient evidence of discriminatory animus. (*See* Resp. at 8.). But, in that case, the "angry Black woman" stereotype was not referenced to suggest that it would be sufficient evidence of discriminatory animus alone, but rather that it may have been present in that particular workplace where "monkey effigies, nooses, an image of the Confederate flag, and racist caricatures of President Obama and Trayvon Martin" were blatantly displayed. *McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398, 413 (4th Cir. 2022) (J. Motz, concurring).

Next, Plaintiff cites a case from the Eastern District of Pennsylvania, noting the court's reproach to what it called "the destructive power" of the angry Black woman stereotype. (*See* Resp. at 7–8.). There, the employer's counselor commented to the plaintiff, a black woman, "that People are afraid of the angry Black woman" in relation to plaintiff's denial of a promotion. *Curry v. Devereux Found.*, 541 F. Supp. 3d 555, 558 (E.D. Pa. 2021). When the plaintiff responded, "I am not an angry Black woman," he retorted, "but you have been angry." *Id*. These statements by the counselor imputed "his views to a larger, albeit unknown, group," and were sufficient to state a claim of discrimination at the motion to dismiss stage.

But that case is substantively and procedurally distinguishable. First, the descriptors used by Ms. Travis and Dr. Ramirez-Perez do not evoke, either expressly or implicitly, a stereotype like the counselor in *Curry*. Second, the matter at bar is at the summary judgment stage that requires a plaintiff to produce affirmative evidence of each element of her case, not merely to state a claim for relief. *Celotex*, 477 U.S. at 322. Such a burden, even if minimal at this stage, is not met by a supervisor's race-neutral, individualized comments regarding a specific employee's workplace conduct. Ultimately, the mere fact that the descriptors used by Ms. Travis and Dr. Ramirez-Perez are synonyms of "angry,"

without more, is not enough to show that they were influenced by a racial stereotype. The cases cited by Plaintiff do not counsel otherwise.

Overall, the Plaintiff does not reach her minimal burden of proof to establish either direct evidence of discriminatory animus or the fourth *prima facie* element under the *McDonnell Douglas* framework, so summary judgment is appropriate as to Count One.

### B.    Count Two: Retaliation

Defendant next argues that summary judgment is warranted because Plaintiff failed to establish a *prima facie* retaliation claim. (Mot. at 11–14.) Title VII prevents employers from retaliating against employees for opposing unlawful discrimination. 42 U.S.C. § 2000e-3(a). "Like discrimination, retaliation may be shown using the McDonnell Douglas burden shifting framework." *McGinest*, 360 F.3d at 1124. To establish a *prima facie* case of retaliation, a plaintiff must show (1) that they "engaged in protected activity"; (2) that thereafter "adverse employment action" was taken against them; and (3) "a causal link exists between the two" events. *Cohen v. Fred Meyer, Inc.,* 686 F.2d 793, 796 (9th Cir. 1982).

### 1.    *Protected Activities*

An employee engages in protected activity when she makes a charge, testifies, assists, participates in an investigation, proceeding or hearing regarding unlawful employment practices, or otherwise participates "in the machinery set up by Title VII to enforce its provisions," like contacting an EEO officer. *Hashimoto v. Dalton*, 118 F.3d 671, 680 (9th Cir. 1997) (citation modified); *see also* 42 U.S.C. § 2000e-3(a).

Plaintiff identifies three categories of activities that she deems protected under Title VII: (1) reporting unfair treatment to Human Resources on May 15, 2018 after not being offered an interview for the Director position; (2) requesting her screening materials on June 18, 2018; and (3) reporting race discrimination and retaliation to Human Resources and the EEO Office on November 8, 2018 and December 4, 2018 and December 17, 2018 after being disciplined by Ms. Travis. (Resp. at 10, 19; ASOF ¶¶ 9, 44.)

The first two categories of activities are not protected under Title VII. Plaintiff's

May 15, 2018 report is not actionable under Title VII because it occurred *before* the 300-day cutoff date of June 9, 2018. While her June 18, 2018 email to Mr. Wilber falls within that 300-day window, it is not the kind of activity that evokes "the machinery set up by Title VII" because she requested her screening materials to conduct her own personal review after Mr. Wilber's investigation was already complete. (*See* Doc. 85-1 at 221–22.)

As to the third category of activities, there is no evidence that Plaintiff made any reports on November 8, 2018. It is undisputed, however, that Plaintiff met with Dr. Hall, Defendant's EEO officer, on December 4, 2018. (SOF ¶¶ 51–52; CSOF ¶¶ 51–52.) Dr. Hall's handwritten notes of that meeting reflect that Plaintiff reported her belief that the November 8, 2018 warning was issued in retaliation for Plaintiff's earlier complaints about the Director hiring process, that she was the only African American analyst, and that she planned to file a complaint against Ms. Travis. (*Id.*)

These notes, when taken together and viewed in a light most favorable to Plaintiff, suggest that Plaintiff reported race-based discrimination and retaliation against her due to earlier internal complaints she made; otherwise, Dr. Hall's note regarding "retaliatory" conduct, Plaintiff's race, and Plaintiff's intent to file a complaint would be meaningless. This meeting and Plaintiff's subsequent EEO Complaints are "quintessential" activities protected by Title VII, *McGinest*, 360 F.3d at 1125 n.19; *accord Ray v. Henderson*, 217 F.3d 1234, 1240 n.3 (9th Cir. 2000); *Hashimoto*, 118 F.3d at 680, so Plaintiff satisfies this element of the *prima facie* test for a retaliation case.

### 2.    *Adverse Employment Action*

An adverse employment action is one that "is reasonably likely to deter employees from engaging in protected activity," *Ray*, 217 F.3d at 1237, and includes termination, *Alozie v. Ariz. Bd. of Regents*, 562 F. Supp. 3d 203, 214 (D. Ariz. 2021). The Court has already determined that Plaintiff established a genuine issue of material fact as to whether her resignation constitutes an adverse employment action.

Plaintiff additionally argues that Defendant's investigation of her EEO Complaints was "negligent," and therefore adverse, because it occurred after her non-renewal and took

longer than her entire probationary period. (Resp. at 19.) Even so, an inadequate investigation after an alleged discrimination act does not generally qualify as an adverse employment action for a retaliation claim. *Cozzi v. Cty. of Marin*, 787 F. Supp. 2d 1047, 1069 (N.D. Cal. 2011). Plaintiff presents no argument as to how this investigation, even if it was finished after her termination, would depart from this general rule.

While Defendant's investigation of the EEO Complaints does not constitute an adverse employment action for the purpose of Plaintiff's retaliation claim, Plaintiff's nonrenewal does. Plaintiff satisfies this element of the *prima facie* test for a retaliation case.

### 3.  *Causation*

To establish a causal link, a plaintiff must show that the employer's retaliation "was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362–63 (2013). Put another way, causation "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id*. at 360. The causation element of Title VII retaliation claims "must be proved according to traditional principles of but-for causation," *Nassar*, 570 U.S. at 360, which "directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause," *Bostock v. Clayton Cnty.*, 590 U.S. 644, 656 (2020). A plaintiff may present either direct or circumstantial evidence from which causation can be inferred. *Cloud v. Brennan*, 436 F. Supp. 3d 1290, 1301 (N.D. Cal. 2020).

Here, Plaintiff presents no direct evidence that Defendant decided not to retain Plaintiff *because of* her meeting with Dr. Hall or her EEO Complaints. Rather, Plaintiff relies exclusively on the timing of the adverse employment action—two months after filing her EEO Complaints—as circumstantial evidence of causation. Timing can establish a causal link when, as here, an employer's actions are "close on the heels" of a plaintiff's complaint. *Ray*, 217 F.3d at 1244; *see, e.g.*, *Equal Emp. Opportunity Comm'n v. Tesla, Inc.*, 727 F. Supp. 3d 875, 895 (N.D. Cal. 2024) (finding that an adverse employment action occurring "within weeks" of protected activity support an inference of causation).

Defendant argues that the non-renewal decision occurred *before* Plaintiff engaged

in protected activity and "it is not retaliation for an employer to continue forward with course of conduct that was contemplated prior to the employer's knowledge protected activity." (Mot. at 12–13.) If Defendant did, in fact, decide non-renewal beforehand, it "need not suspend previously planned [decisions] upon discovering that a Title VII suit has been filed, and [it] proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Clark Cnty. School Dist. v. Breeden*, 532 U.S. 268, 272 (2001).

Defendant's theory induces three questions: (1) which of Defendant's employees were responsible for non-renewal decisions, (2) when did those employees became aware of Plaintiff's protected activities; and (3) when did those employees contemplate or decide non-renewal?

As to the first question, it is undisputed that Ms. Travis was responsible for making termination decisions subject only to the approval by the staff of the Human Resources department. (SOF ¶¶ 19, 66; CSOF ¶¶ 19, 66.)

Second, the record shows that Ms. Travis became aware of the protected activity on January 16, 2019, when she received Dr. Hall's notice of the EEO Complaint against her. (SOF ¶ 57; CSOF ¶ 57.) While Plaintiff points to an email to suggest that Ms. Travis knew of Plaintiff's protected activities as early as December 13, 2018 (CSOF ¶ 59), that email shows only that Plaintiff responded to Ms. Travis' attempt to clarify Plaintiff's time-off requests that "[t]his is employee harassment." (Doc. 85-1 at 50–52.) This email was sent before Plaintiff even filed her EEO Complaints and nowhere does she allude to her December 4th meeting with Dr. Hall or that she intended to file a complaint. This email alone does not show that Ms. Travis could have known of Plaintiff's protected activities.

Third, according to Ms. Travis' deposition testimony, she initiated her non-renewal request with Ms. Kussard "around the time of that incident with the student" but had "to first go through the—a verbal warning or coaching or have some conversations." (Doc. 85-1 at 133–34.) Around this time, she had phone calls and meetings with Ms. Kussard to discuss non-renewal (*id*. at 134), which is supported by a November 15, 2018 email from

Ms. Kussard to Ms. Travis and Dr. Ramirez-Perez "reminding" them that there were "[e]xpectations" provided to Plaintiff with her job offer and her probation would end on March 17, 2019 (*id.* at 355–56). This suggests that Ms. Travis discussed Plaintiff's probation and job expectations with Ms. Kussard before November 15, 2018 that would have prompted the reminder email. Ms. Travis' testimony, the date of the warning email, and the date of Ms. Kussard's reminder email show that Ms. Travis was contemplating non-renewal before November 15, 2018.

Plaintiff believes the timing of the decision took place in February 2019. (Resp. at 10–12.) But an action need not be "definitive" before an employer proceeds "along lines previously contemplated." *Breeden*, 532 U.S. at 272. Interestingly, Plaintiff's own deposition testimony supports that Defendant contemplated non-renewal before February 2019. Plaintiff testified that when she reviewed the documents attached to the EEOC position statement, she "realized that prior to even January 2019, her—Felicia Ramirez-Perez and Alison had already gone to the District and were trying to request my termination . . . it was odd because that was before I even submitted—I'm pretty sure that was before I had submitted my complaint." (Doc. 85-1 at 387.)

Plaintiff does point out one contradiction, though, and that is a January 17, 2019 meeting that took place one day after Ms. Travis and Dr. Ramirez-Perez were notified of the EEO Complaints. The meeting minutes reflect that participants had the goal of improving the communication and expectations between Ms. Travis and Plaintiff. (Doc. 85-1 at 100; *see also* Resp. at 12.) According to Plaintiff, "it makes no sense to have four high level Directors and above take time to meet with one employee about communication issues if the decision to terminate that person's employment had already been made." (*Id.*) A reasonable juror could conclude from the interest shown by Plaintiff's chain of command in improving Plaintiff's relationship and communication with Ms. Travis that they were not contemplating non-renewal at that time. This factual contradiction, while minimal, is enough to create a genuine dispute of material fact as to whether Ms. Travis was contemplating non-renewal only after discovery of Plaintiff's protected activities. This

dispute and the temporary proximity of non-renewal to Plaintiff's EEO Complaints meets the minimal burden of proof of causation required for a *prima facie* case of retaliation.

### 4.    *Non-Retaliatory Reason for Adverse Employment Action*

Having established each element of a *prima facie* case of retaliation, the burden now shifts to Defendant to articulate legitimate, non-discriminatory reasons for the challenged action. *McDonnell Douglas Corp.*, 411 U.S. at 802.

Defendant argues that its non-renewal decision was based upon Plaintiff's "unsatisfactory job performance," "misrepresentation of a serious safety issue," and insubordination. (Mot. at 4, 7–9.) Defendant produces sufficient evidence that Plaintiff undermined Ms. Travis' authority and did not comply with policies. First, there are many emails between Ms. Travis and Plaintiff in which Ms. Travis reiterates her expectations and policies for scheduling work hours and reporting time away from the office. (Doc. 85-1 at 14–25, 44–48, 50–56, 71–73, 95–96, 182–83.) Second, Ms. Travis declared that Plaintiff argued with her regarding the details of a project that she assigned to Plaintiff and disregarded Ms. Travis' directions. (*Id.* at 6–7 ¶¶ 19–20.) Third, Ms. Travis testified in her deposition that, from her perspective, Plaintiff misrepresented "some safety concerns" during the November 2, 2018 student incident despite Ms. Travis asking Plaintiff for her assessment of the student. (*Id.* at 7–8 ¶¶ 23–24; Doc. 88-2 at 55–57.) Fourth, in February 2019, Plaintiff attempted to change staff scheduling for an event after Ms. Travis already set the schedule, causing confusion among staff. (Doc. 85-1 at 104–07.) Finally, Plaintiff misadvised students in August 2018 and January 2019. (*Id.* at 27, 58–59.) These incidents were also referenced by Ms. Travis in her formal request for non-renewal. (*Id.* at 85-1 at 114–16.) Such evidence satisfies Defendant's burden of production to show a legitimate, non-retaliatory reason for Plaintiff's non-renewal.

### 5.    *Pretext*

Now that Defendant establishes a legitimate, non-retaliatory reason for non-renewal, Plaintiff must show that the "reason is pretextual either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by

showing that the employer's proffered explanation is unworthy of credence." *Davis*, 520 F.3d at 1089 (citation modified); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). "The trier of fact may still consider the evidence establishing the plaintiff's *prima facie* case and inferences properly drawn therefrom on the issue of whether the defendant's explanation is pretextual." *Id*. (citation modified). But "[d]isputing only one of several well-supported, independently sufficient reasons for termination is generally not enough to defeat summary judgment." *Curley v. City of N. Las Vegas*, 772 F.3d 629, 633 (9th Cir. 2014) (*citing Cotton v. City of Alameda*, 812 F.2d 1245, 1248 (9th Cir. 1987)).

A plaintiff may produce direct evidence of pretext that, if believed, "proves the fact of discriminatory animus without inference or presumption." *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1066 (9th Cir. 2003), as amended (Jan. 6, 2004) (citation modified). "When the plaintiff offers direct evidence of discriminatory motive, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial." *Id*. Here, it is unclear whether Plaintiff argues that Ms. Travis's and Dr. Ramirez-Perez's purported use of the "angry Black woman" stereotype is direct evidence of pretext, but to the extent she does, the Court already determined that there is insufficient evidence to support that theory.

Alternatively, "a plaintiff may rely on circumstantial evidence to show pretext," but "such evidence must be both specific and substantial." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002). Examples of "specific, substantial evidence of pretext" required to avoid summary judgment include "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons," *Hooker v. Parker Hannifin Corp.*, 548 F. App'x 368, 370 (9th Cir. 2013) (citation modified); *see Payne v. Norwest Corp.*, 113 F.3d 1079, 1080 (9th Cir. 1997), disparate treatment relative to similarly situated employees, *Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 694–95 (9th Cir. 2017), and close temporal proximity between the protected activity and the adverse employment action, *Dawson v. Entek Int'l*, 630 F.3d 928, 937 (9th Cir. 2011).

The record shows that Defendant's reasons for non-renewal have remained consistent over time. (*See* Doc. 85-1 at 35 (Ms. Travis describing insubordination); *id.* at 75 (Ms. Travis discussing noncompliance with policy); *id.* at 114 (Ms. Travis recommending nonrenewal based on, *inter alia*, insubordination and noncompliance with policies).) Despite this, Plaintiff takes issue with Dr. Ramirez-Perez's testimony that, according to Plaintiff, contradicts Defendant. (Resp. at 15.) Specifically, Dr. Ramirez-Perez testified that Ms. Travis told her that Plaintiff did not submit an incident report regarding the November 2, 2018 student incident. (Doc. 88-2 at 92.) But Dr. Ramirez-Perez's testimony does not create the contradiction that Plaintiff claims to exist. First, Dr. Ramirez-Perez did not testify, at least in the deposition transcript provided by Plaintiff, that she believed the warning issued by Ms. Travis was *only* because Plaintiff purportedly failed to submit an incident report. Second, evidence shows that Ms. Travis emailed Dr. Ramirez-Perez about the student incident, sent her draft emails of the warning for review, and copied her on the final warning email to Plaintiff, and in none of those emails did Ms. Travis suggest that Plaintiff failed to submit an incident report. Dr. Ramirez-Perez's testimony does not show, as Plaintiff contends it does, that Ms. Travis lied about the reasons for the warning; nor does it undermine Defendant's proffered explanation that the non-renewal was due to Plaintiff's insubordination and noncompliance with policy and instructions.

Plaintiff additionally contends that Ms. Travis contradicted herself regarding the reasons for issuing the warning. According to Plaintiff, Ms. Travis "admitted at her deposition that the only thing 'incorrect' in Ms. Garcia's incident report was minor detail that she offered Ramirez-Perez's card to Ms. Garcia." (Resp. at 9; ASOF ¶ 37.) But Plaintiff mischaracterizes that testimony. When read in context, Ms. Travis's concern was not that there were portions of Plaintiff's incident report that Ms. Travis thought to be incorrect; it was that Ms. Travis "specifically asked if there was concerning behavior, and [Plaintiff] said no, but she then later submitted the report for concerning behavior." (Doc. 88-2 at 56.) There is no contradiction here.

Plaintiff next argues that the record contradicts Defendant's timeline of the non-

renewal decision and establishes pretext. (Resp. at 15.) According to Plaintiff, "Defendant claims that [Dr.] Ramirez-Perez and Dr. Hall decided not to retain Ms. Garcia in fall 2018" but "no decision to terminate was made until February 2019." (*Id.*) The evidence does show that non-renewal was formally recommended, approved, and effected in February 2019. But there is other evidence that shows that Ms. Travis and the Human Resources department were contemplating, and potentially decided, non-renewal earlier. This timeline is not contradictory.

Critically, Plaintiff proffers no evidence that Defendant's stated reasons for non-renewal—notably her noncompliance with scheduling policies or supervisor instructions, and characterization that the student displayed no concerning behavior when her supervisor asked—were false. *See, e.g.*, *Reeves*, 530 U.S. at 144–45 (finding that the employee established pretext by providing evidence casting doubt upon, or outright disproving, the employer's explanation); *Curley*, 772 F.3d at 633–34 (finding that disputing one of four legitimate reasons for termination was insufficient to overcome summary judgment). There is also no evidence that Ms. Travis or Dr. Ramirez-Perez "became increasingly hostile" after Plaintiff met with Dr. Hall or filed her EEO Complaints.

The crux of Plaintiff's theory is that, sometime before January 2019, Ms. Travis became aware of Plaintiff's earlier reporting of the Director hiring process. (Resp. at 19–20.) Thereafter, "Travis began documenting supposed performance concerns, initiated disciplinary action based on the irreconcilable account of the November student incident, and contacted Human Resources on February 20, 2019 about terminating Ms. Garcia." (Resp. at 19.) While Title VII makes it unlawful for an employer to discriminate against an employee who opposed an unlawful employment practice, 42 U.S.C. § 2000e-3(a), Plaintiff's earlier reporting that predates June 9, 2018 is not actionable. Even if it was, Plaintiff identifies no evidence showing that Ms. Travis knew of Plaintiff's earlier reporting before January 16, 2019 when she received Plaintiff's EEO Complaint, or that her decision to recommend non-renewal was motivated by Plaintiff's earlier reporting. *See, e.g.*, *Stegall*, 350 F.3d at 1070–71 (reviewing statements made by the employee's supervisor that

indicated the supervisor held animosity against the employee for earlier reporting of gender discrimination).

Finally, Plaintiff argues that the timing of her non-renewal demonstrates pretext. "While evidence of temporal proximity is sufficient to demonstrate a *prima facie* case of retaliation, the first step in the *McDonnell Douglas* burden-shifting test, it is ordinarily insufficient to satisfy the secondary burden to provide evidence of pretext." *Hooker*, 548 F. App'x at 370. Whether Ms. Travis had contemplated or decided non-renewal before or after she discovered Plaintiff's protected activities on January 16, 2019 is a factual dispute that cannot be resolved at this stage. But even resolving that dispute in Plaintiff's favor and assuming, for the moment, that Ms. Travis contemplated and decided non-renewal only after January 16, 2019, that timing is logical given that Plaintiff's probationary period was approaching its inevitable end. Therefore, even when inferences are made in favor of Plaintiff, the timing of the non-renewal, consistency in Defendant's reasoning for non-renewal, and lack of any other circumstantial evidence of retaliatory motive, fall short of the "specific and substantial" evidence to support a finding of pretext. Plaintiff fails to establish a genuine dispute of material fact as to the elements of her retaliation claim under the *McDonnell Douglas* framework.

### 6. *Failure to Hire*

To the extent that Plaintiff's second claim also includes a distinct failure to hire claim (*see* SAC ¶¶ 34–35), Defendant argues that such allegations are not present in Plaintiff's EEOC Charge and she is precluded from pursing that claim. (Mot. at 14–15.) Plaintiff fails to address this argument at all. The Court construes Plaintiff's silence as a concession that such a claim is not actionable. *See Johnson v. Macy*, 145 F. Supp. 3d 907, 918 (C.D. Cal. 2015) (finding a party's failure to address an argument "is an implicit concession").

## IV.   CONCLUSION

In sum, Plaintiff fails to produce sufficient evidence to create a genuine issue of material fact as to the elements of her claims. Accordingly, summary judgment in

Defendant's favor is appropriate. Defendant's Motion to Strike will be denied as moot.

**IT IS ORDERED** granting Defendant's Motion for Summary Judgment (Doc. 84).

**IT IS FURTHER ORDERED** denying as moot Defendant's Motion to Strike Plaintiff's Contravening Separate Statement of Facts in Opposition to Defendant's Motion for Summary Judgment (Doc. 90).

**IT IS FURTHER ORDERED** directing the Clerk of Court to enter judgment in Defendant's favor and close this case.

Dated this 6th day of April, 2026.

Honorable John J. Tuchi
United States District Judge